

~~SEALED~~

*Filed 6-14-12*

AO (Rev. 5/85) Criminal Complaint

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

UNITED STATES OF AMERICA

vs.

MICHAEL JOHNSON

**CRIMINAL COMPLAINT**

CASE NUMBER: 6:12-mj-1280

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief. On or about February 21-28, 2012, in Orange County, in the Middle District of Florida, defendant did,

> Knowingly, willfully, and intentionally possess with the intent to distribute and distribute a controlled substance, specifically a mixture and substance containing a detectable amount of cocaine base, commonly referred to as "crack cocaine."

in violation of Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C). I further state that I am a Task Force Agent with DEA, and that this Complaint is based on the following facts:

SEE ATTACHED AFFIDAVIT

Continued on the attached sheet and made a part hereof:  ☒ Yes  ☐ No

_____
Signature of Complainant
Denis P. Smith

Sworn to before me and subscribed in my presence,

June 14th, 2012 _____   at   Orlando, Florida _____

Gregory J. Kelly
United States Magistrate Judge
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

STATE OF FLORIDA                                    CASE NO. 6:12-mj- 1280

COUNTY OF ORANGE

### CRIMINAL COMPLAINT AFFIDAVIT

I, Denis P. Smith, having been duly sworn, hereby make the following statement in support of the attached criminal complaint:

Introduction

1. I am a duly sworn Task Force Officer with the United States Drug Enforcement Administration (hereinafter referred to as "DEA"), Orlando District Office. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516. I have been a Task Force Officer with the DEA since October 2001.

2. I have been employed by the Orange County, Florida, Sheriff's Office since 1994. I have received extensive training pertaining to narcotic investigations and the investigation of various crimes which arise from drug trafficking activities.

3. I have participated in, and conducted investigations of, violations of various federal, state, and international drug laws, including unlawful possession with intent to distribute controlled substances, distribution of controlled substances, use of communication facilities to commit narcotics offenses, conspiracy to import controlled substances, and money laundering, all in violation of Title 21 and Title 18 of the United States Code. I have been the case agent

and affiant on other federal and state court orders authorizing the interception of wire communications. These investigations have resulted in arrests of individuals who have smuggled, received, and distributed controlled substances, including cocaine, marijuana, heroin, and methamphetamine.

4. I have also conducted investigations concerning the identification of co-conspirators through the use of telephone records, financial records, drug ledgers, and other pertinent documents. I have participated in the debriefings of many of those individuals who were arrested and cooperated with the government in regards to various violations of Title 21 and Title 18 of the United States Code.

5. I have directed numerous confidential informants and cooperating witnesses to successfully infiltrate various narcotics organizations by way of intelligence gathering, participation in consensual recordings, and purchases of controlled substances. I have purchased controlled substances as an undercover agent, executed search warrants for controlled substances, and conducted surveillance in connection with numerous narcotics investigations.

6. On the basis of my training and experience, I can attest that individuals involved in the illicit possession, distribution, manufacture, transportation, and trafficking of controlled substances, as well as the laundering of drug proceeds, often use telephones to discuss and facilitate their illegal activities. In order to conceal their identities and avoid detection from law enforcement, narcotics traffickers often enlist the aid of friends, relatives, and acquaintances to distribute or store controlled substances or launder drug

proceeds. Narcotics traffickers often use the names of these individuals or fictitious names to subscribe to telephone services, purchase property, and rent or register vehicles.

7. I submit this affidavit based on information known to me personally from the investigation, as well as information obtained from others who have investigated the matter or have personal knowledge of the facts herein. This affidavit is being submitted in support of a Criminal Complaint against **MICHAEL JOHNSON**, and as such does not include all the information known to me as part of this investigation, but only information sufficient to establish probable cause for their arrest for violating of Title 21, United States Code, Sections 84(a)(1) and (b)(1)(C).

8. In February 2012, Narcotics Agents with the Orange County, Florida, Sheriff's Office (OCSO) received information from a confidential source (CS)[1] that **JOHNSON** was selling crack cocaine from his house, which is located at 322 Penrose Court, Apopka (Johnson's house). The CS believed that he would be able to buy crack from **JOHNSON**. OSCO agents had received information in the past that **JOHNSON** sold cocaine from his house. The CS agreed to assist law enforcement with undercover buys of cocaine from **JOHNSON** and also agreed to wear an undercover audio and video recording device while making the purchases.

---

[1] The CS is providing information to law enforcement pursuant to an agreement with the State Attorney's Office in the hopes of receiving a reduced sentence in a state drug case. The CS has worked on other cases with law enforcement and, according to OCSO agents, has been truthful and reliable in the past.

9. On February 21, 2012, OCSO agents met with the CS at a location in Apopka. Agents searched the CS and his/her vehicle for drugs and contraband, but none were found. Agents provided the CS with $300, a recording device, and instructions to buy crack cocaine from anyone selling it at Johnson's house. Although agents assumed that **JOHNSON** would be selling cocaine, agents instructed the CS to buy from someone else if **JOHNSON** was not there.

10. The CS left the meeting location and drove to Johnson's house.[2] As the CS walked up to Johnson's house, he/she met **JOHNSON** and an unidentified male (UM). After a few minutes of general conversation, all three walked into Johnson's house. The CS waited in the living room while **JOHNSON** went into a back room. **JOHNSON** returned a few minutes later and handed the CS a clear plastic bag, which contained a substance that appeared to be crack cocaine, in exchange for money. **JOHNSON** counted the money in front of the CS. While counting, the UM entered the living room and the three talked about future drug deals. **JOHNSON** told the CS that what **JOHNSON** just gave the CS was not worth $300. **JOHNSON** added that he owed the CS about three (3) more grams and would call the CS went he had it. The CS also obtained a small amount of marijuana from the UM before leaving the residence.

11. Shortly thereafter, the CS left the house and immediately met with OCSO agents, who recovered approximately 2.5 grams of crack cocaine, 4

---

[2] The undercover video that recorded all the transactions in this affidavit were later reviewed by OCSO agents. OCSO agents interviewed the CS after each transaction. After viewing the video with the CS, agents were able to corroborate the CS' recollection of each undercover meeting with **JOHNSON** as accurate.

grams of marijuana, and the recording device from the CS. OCSO agents field tested the substances which tested positive for cocaine and marijuana. The CS and his/her vehicle were searched again for drugs and contraband, but none were found.

12. On February 23, 2012, OCSO agents again met with the CS at a location in Apopka. Agents searched the CS and his/her vehicle for drugs and contraband, but none were found. Agents provided the CS with a recording device and instructions to get the crack cocaine that **JOHNSON** previously shorted the CS during the previous transaction.

13. Agents followed the CS from the meeting location directly to Johnson's house. **JOHNSON** answered the door and invited the CS inside. After a brief conversation, the CS waited in the living room and **JOHNSON** went into a back room. **JOHNSON** returned shortly thereafter with a plastic bag that appeared to contain crack cocaine. **JOHNSON** told the CS that the bag contained 7 grams and the CS could pay him for the extra 4 grams later. The CS agreed and left the house.

14. After leaving Johnson's house, the CS immediately met with OCSO agents, who recovered approximately 7 grams of crack cocaine and the recording device from the CS. OCSO agents field test the substance which tested positive for cocaine. The CS and his/her vehicle were searched again for drugs and contraband, but none were found.

15. When agents reviewed the video recording of the transaction, agents could clearly see a shotgun by the front door and a handgun by a scale in the kitchen area.

16. On February 28, 2012, OCSO agents again met with the CS at a location in Apopka. Agents searched the CS and his/her vehicle for drugs and contraband, but none were found. Agents provided the CS with $360, a recording device, and instructions to pay JOHNSON for the 4 grams of crack cocaine provided to the CS during the previous transaction.

17. Agents followed the CS from the meeting location directly to Johnson's house. JOHNSON answered the door and invited the CS inside. The CS handed JOHNSON the $360, which JOHNSON counted in front of him/her. JOHNSON walked into a back room and returned shortly with a plastic bag containing suspected crack cocaine. JOHNSON handed the bag to the CS and the two talked about future drug deals. A few minutes later the CS left Johnson's house.

18. After leaving Johnson's house, CS immediately met with OCSO agents, who recovered approximately 0.8 grams of crack cocaine and the recording device from the CS. OCSO agents field test the substance which tested positive for cocaine. The CS and his/her vehicle were searched again for drugs and contraband, but none were found.

19. On March 1, 2012, OCSO agents tried to make another purchase of crack cocaine from JOHNSON. JOHNSON told the CS that he was headed to his supplier and would return shortly with the drugs. While waiting for JOHNSON

to return, OCSO agents used the CS to purchase drugs from another individual in the Apopka area. Agents arranged to meet with the CS in a parking lot after the above deal was done and **JOHNSON** drove by the location and saw the CS meeting with people who clearly were identified as law enforcement officers. Later, **JOHNSON** called the CS and told the CS, among other things, that **JOHNSON** could not believe that the CS set him up. Approximately 4 days later **JOHNSON** approached OCSO Sergeant Ken Taylor on a street corner in Apopka and said, among other things, that **JOHNSON** "could not go back to jail" and asked for some time to put his affairs in order before his arrest.

20. During the course of this investigation, I learned that **JOHNSON** is currently serving a term of supervised release after being released from prison following his conviction for possession with the intent to distribute 5 grams or more of cocaine base, commonly referred to as "crack cocaine," in case number 6:04-cr-64-Orl-22DAB. As a result of successfully completing the Court's Reentry Program, **JOHNSON'S** supervised release is scheduled to terminate on October 28, 2013.

21. Based on the aforementioned facts, your affiant submits that there exists probable cause to believe that **JOHNSON** did knowingly, willfully, and intentionally possess with the intent to distribute and distribute a controlled substance, specifically a mixture and substance containing a detectable amount of cocaine base, commonly referred to as "crack cocaine," in violation of Title 21 United States Code, Sections 841(a)(1) and (b)(1)(C).

Further your affiant sayeth naught.

_____
Denis P. Smith, Task Force Officer
Drug Enforcement Administration

Subscribed and sworn to me
before this 14th day of June, 2012.

_____
The Honorable Gregory J. Kelly
United States Magistrate Judge